**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**HELENA DIVISION**

**HELENA CHEMICAL COMPANY**                                                              **PLAINTIFF**

**v.**                                          **CASE NO. 2:08-CV-00118 BSM**

**TRIPLE C. RANCH; EARL D. COX,**
**and IRMA COX**                                                                           **DEFENDANTS**

## ORDER

Before the court is plaintiff Helena Chemical Company's motion for summary judgment. For the reasons stated below, summary judgment is denied.

## I.  BACKGROUND

Defendants Earl D. Cox and Irma Lee Cox are partners in Triple C Ranch along with their son, Lee Cox, who farmed for several years near Watson, Desha County, Arkansas. From 2003 through 2005, Lee Cox received an extension of credit from Helena Chemical Company ("HCC") to purchase crop production inputs in the name of Lee Cox Farms.

The affidavit of Curtis Hopkins, a credit manager for HCC, states that between 2003 and 2005, Lee Cox was not sufficiently credit-worthy to obtain credit without security.  Ex. D, Hopkins aff., plaintiff's motion for summary judgment ("pltf.'s motion").  Lee Cox obtained an extension of credit only in conjunction with an agreement from Merchants and Farmers Bank to release its lien on the proceeds of Lee Cox Farms' crops, on which the bank held a first lien, so that HCC would be repaid from those proceeds.  *Id*.  Hopkins states that a new agreement was required from Merchants and Farmers Bank each spring.  *Id*.  HCC

provides the 2003-2005 agreements entered into and signed by Merchants and Farmers Bank, Lee Cox Farms (by Lee and Elizabeth Cox), and HCC.  Ex. D-1, pltf.'s motion.

Hopkins states in his affidavit that in 2006, Lee Cox requested an extension of credit from HCC that would not involve an agreement from Merchants and Farmers Bank, but he was still not sufficiently credit-worthy to obtain credit without security.  Ex. D, Hopkins aff., pltf.'s motion.  *Id.*  On March 24, 2006, Lee Cox submitted an application for credit to HCC naming "Triple C Ranch" as the "Name Under Which Applicant Does Business."  Ex. A, application, pltf.'s motion.  The Credit Sales and Services Agreement provides that it "shall be governed by Tennessee law without regard to the choice of law rules."  *Id.*

Hopkins states that although Lee Cox may have requested credit in the name of Lee Cox Farms, HCC only approved an extension of credit in the name of Triple C Ranch because Merchants and Farmers Bank held prior liens on most of the assets of Lee Cox Farms.  Ex. D, Hopkins aff., pltf.'s motion.  As a condition of the extension of credit to Triple C Ranch, HCC required security and guarantees from all of the partners in Triple C Ranch.  *Id.*

On April 7, 2006, Earl D. Cox, Irma Lee Cox, and Elizabeth Cox signed a Guarantee Agreement, which provides in pertinent part:

> To induce Helena Chemical Company . . . (hereinafter referred to as "Helena") to sell and deliver merchandise on credit to Triple C Ranch (hereinafter referred to as "Principal Debtor") and for other valuable consideration, the undersigned UNCONDITIONALLY GUARANTEES payment to Helena of any and all indebtedness of the Principal Debtor to Helena, whether now existing or hereinafter incurred.

It is further understood and agreed that this guaranty is given by the undersigned and accepted by Helena based on the following:
. . .

The undersigned hereby waives notice of the acceptance of this guaranty by Helena and notice of all credits extended and sales and deliveries of merchandise to the Principal Debtor.

This instrument is intended to be and shall be construed to be a continuing guaranty and shall remain in full force and effect until the undersigned shall have given Helena notice in writing, by certified mail return receipt requested, to make no further advances on the security of the guaranty and until such written notice shall be received by Helena.  Proof of receipt by Helena of such notice shall be on the undersigned.  Such notice shall be delivered to Helena at its address shown below.  Such revocation, when made, shall apply only to sales made to the Principal Debtor subsequent to the receipt of such notice of revocation, and any payments thereafter made by the Principal Debtor shall be applied as Helena may elect.

In the event of default by the Principal Debtor in payment of the debt guaranteed hereunder, or any part thereof, recovery thereof may be had directly against the undersigned guarantor without previous notice and/or without requiring the prosecution of any claim against the Principal Debtor; the obligations of the undersigned constituting a guaranty of payment, not a guaranty of collection from the Principal Debtor.

Ex. B, guarantee agreement, pltf.'s motion.  A credit limit of $160,000 was requested, and appears to have been approved by Craig Dunn on May 4, 2006.  Ex. A, application, pltf.'s motion.

The affidavit of Laura Wills, assistant to the credit manager for HCC, states that she set up the Triple C Ranch account in HCC's Oracle software accounting system.  Ex. M, Wills' aff., pltf.'s reply.  She states that because HCC was not extending credit to Lee Cox Farms in 2006, she simply changed the name on account number 1566934 from Lee Cox Farms to Triple C Ranch.  *Id.*  Thus, Lee Cox had only one credit account with HCC in 2006,

which was in the name of Triple C Ranch after May 4, 2006. *Id.* She further states that if

Lee Cox needed agricultural inputs before his 2006 account for Triple C Ranch was set up,

the existing account number could have been opened for credit before the credit application

was processed and the account name changed. *Id.* Thus, any invoices printed prior to May

4, 2006, would have printed "Lee Cox Farms," even though the customer to which HCC

extended credit was Triple C Ranch. *Id.*

The affidavit of Warren Nash, a credit manager for HCC, states that during the 2006

growing season, Triple C Ranch reached its initial credit limit of $160,000, and HCC agreed

to increase the credit limit to $250,000. Ex. C, Nash aff., pltf.'s motion. He states that Triple

C Ranch paid part of the balance owed in late 2006 and early 2007, but a principal balance

of $124,635.18 remains unpaid. *Id.* The balance due with accrued interest through February

20, 2009, totals $139,982.50, with $19.04 in interest accruing daily at current rates. *Id.*

Nash states that to his knowledge, each delivery ticket recording delivery of inventory

and sale of products lists Triple C Ranch as the customer to whom the sale was made. *Id.*

Nash states that the invoices dated May 1-3, 2006, lists Lee Cox Farms as the customer, but

the corresponding delivery tickets list Triple C Ranch as the customer. *Id.* It is his belief that

the May 1-3 invoices were issued before Triple C Ranch was set up as the credit customer

in HCC's computer system, but thereafter HCC removed Lee Cox Farms as the customer on

the existing credit account and inserted Triple C Ranch as the customer on the account based

on the March 24, 2006, application for credit. *Id.* Nash states that after the name on the

4

credit account was changed, HCC had no credit account for Lee Cox, Lee Cox Farms, or Lee Cox Farms Partnership, and thus, Lee Cox's purchases from HCC in 2006 were charged to the Triple C Ranch credit account. *Id*. He also states that the 2006 monthly statements mailed to RRI, Box 10, Watson, AR 72674, identified Triple C Ranch as HCC's customer. *Id*.

Nash states that Lee and Libby (Elizabeth) Cox, partners in Triple C Ranch and co-guarantors under the Guaranty Agreement, filed for personal bankruptcy on November 2, 2006, without paying the balance on the open credit account. *Id*. Although Earl and Irma Cox filed for Chapter 13 bankruptcy on February 29, 2008, the bankruptcy was dismissed on the Coxes' motion. *Id*.

In his deposition, Lee Cox testified that Earl and Irma Cox, his parents, live at Route 1, Box 10, Watson, Arkansas. Ex. L, Lee Cox dep. p. 7, pltf.'s motion. He also testified that he talked to Craig Wynn about all of the credit purchases going on the account of Triple C Ranch when he was no longer receiving Lee Cox Farms invoices. *Id*. at 70. Wynn explained that it was "too hard for them to keep up with . . . that they wanted to just put it all on Triple C." *Id*. at 70-71. Lee Cox testified that he asked Wynn to talk to Curtis Hopkins and "find out what's going on." *Id*. at 71. Lee Cox states that Wynn told him, "It's too hard for us to keep up with what's going on where," so, "they wanted to just put it on one account," despite his requests to put certain items on Lee Cox Farms. *Id*. Lee Cox understood that his agreement with Curtis Hopkins was that he would have two accounts and states that Hopkins

asked how much it would take to run Lee Cox Farms and Triple C Ranch. *Id*. at 72-73. Lee

Cox testified that neither Wynn nor Hopkins told him that Lee Cox Farms had a certain

amount of credit, but he also stated that he was not informed of the credit limit for Triple C

Ranch either. *Id*. at 73.

In his affidavit, Earl D. Cox states that both Lee Cox Farms and Triple C Ranch had

accounts in 2006 with HCC and each had separate names and account numbers. Ex. A, Earl

Cox aff., defendants' response to plaintiff's motion for summary judgment ("defs.' resp.").

He further states:

> 4. Shortly into the 2006 growing season, without my knowledge or consent or the consent of anyone at Triple C Ranch, Helena Chemical unilaterally started charging all purchases of Lee Cox Farms and Triple C Ranch to my one account of Triple C Ranch. This was a mistake and error on the part of Helena Chemical for which neither me, my wife or Triple C Ranch is responsible.

> 5. Triple C Ranch paid in full its bill to Helena Chemical for all of the product, seed and chemicals it took delivery of and used in the 2006 growing season and no monies are due Helena Chemical for that account.

> 6. The invoices attached to Plaintiff's Motion for Summary Judgment which are in fact billed to Triple C Ranch are not for products that were supplied or used by Triple C Ranch, but are in fact many of these tickets are for purchases made by Lee Cox Farms and used on Lee Cox Farms.

> 7. Helena Chemical did not have a policy in place on each of the delivery tickets showing where the product was being sent to and did not have signatures on all of the invoices showing which farmer or which entity in fact picked up the products.

*Id*. Likewise, in his affidavit, Lee Cox states:

6

[W]ithout my knowledge or consent, Helena Chemical unilaterally started billing all of the products for Lee Cox Farms and Triple C Ranch to Triple C Ranch.  Although, Lee Cox Farms was picking up the necessary product and chemical for Lee Cox Farms, Helena Chemical on its own failed and refused to bill Lee Cox Farms for this and instead erroneously billed Triple C Ranch for Lee Cox Farms purchases. . . . Upon discovering this, I confronted Craig Wynn, Manager of Helena Chemical and he informed me that they simply did this for their convenience as it would simply be easier to bill one account.  I objected to this and told him, no these were two separate farms, two separate accounts and needed to be billed separately as they had started out doing in the beginning of 2006.  Again, he stated this was simply for their own personal convenience and failed and refused to bill the two farm accounts separately for the separate products purchased by each account. . . .I never authorized Helena Chemical to change the Lee Cox Farms account to Triple C Ranch in HCC's computer system.

Ex. B, Lee Cox aff., defs.' motion.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)).

## III.  MOTION FOR SUMMARY JUDGMENT

HCC moves for summary judgment on its breach of contract claim against Earl D. Cox and Irma Cox (collectively "defendants") in the amount of $139,982.50, with prejudgment interest thereon after February 20, 2009; its costs, attorney's fees, and expenses; and postjudgment interest at the highest rate allowed by law until paid on all such amounts.

7

HCC contends that defendants are liable as guarantors because they "unconditionally" guaranteed payment to HCC "any and all indebtedness" of the principal debtor, Triple C Ranch. HCC notes that defendants waived notice of all credits extended and sales and deliveries of merchandise to the principal debtor, and defendants never gave written notice to HCC to make no further advances to the account of Triple C Ranch. HCC contends that defendants are jointly and severally liable to HCC for the debts of Triple C Ranch as partners in Triple C Ranch at the time the unpaid purchases were made. *See* Ark. Code Ann. § 4-46-306(a) ("[A]ll partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law.").

Defendants assert that they and Triple C Ranch paid all of the indebtedness for the products actually used by Triple C Ranch for the 2006 growing season in the amount of $127,915.56. As such, defendants assert that they are not indebted to HCC due to HCC's unilateral mistake of billing all products used by both entities to Triple C Ranch. Defendants state that HCC's failure to track the actual use of the products it sold, and its failure to have the customers for either Lee Cox Farms or Triple C Ranch sign the tickets when they picked up or purchased products, precludes them from now asserting that these items were in fact delivered to or used by Triple C Ranch. Defendants state that it was custom and policy that Lee Cox Farms was not required to enter into a Credit Application and Credit Sales and Service Agreement because he had previously entered into such an agreement in 2003. Defendants also state that Lee Cox Farms was informed by HCC he would not have to sign

such an agreement on an annual basis pursuant to this standard procedure.  Defendants assert

that HCC began the growing season by billing Lee Cox Farms and Triple C Ranch under

separate account numbers.  Defendants rely on the fact that the May 1-3, 2006 invoices are

billed to Lee Cox Farms in support of their assertion that HCC billed Lee Cox Farms and

Triple C Ranch separately in the beginning of 2006.

In reply, HCC asserts that it extended no credit to Lee Cox Farms in 2006, and notes

that defendants fail to provide any documentation supporting their assertion that Triple C

Ranch and Lee Cox Farms had separate account numbers.  HCC states that the two entities

could not have simultaneously had separate credit accounts with distinct account numbers

because HCC removed the name "Lee Cox Farms" from account number 1566934 and

replaced it with the name "Triple C Ranch."

HCC states that every delivery ticket for products purchased on credit from HCC

during 2006 and every invoice beyond May 3, 2006, was written in the name of Triple C

Ranch.  The court notes, however, that a delivery ticket dated May 24, 2006, billed on

invoice number 6634371, and two undated delivery tickets billed on invoice numbers

6634058, 6634059, 6634123, and 6634124, list "Lee Cox" in the "Bill To" section.  *See* Ex.

H, pltf.'s motion.  All of these invoices were paid by check 1242.  *Id.*

HCC further asserts that it had the contractual right to apply payments as it did

pursuant to paragraph 4 of the Credit Sales and Services Agreement, which provides, "All

payments made by the purchaser will be applied as provided for in remittance advice

furnished by purchaser to Helena.  In the event purchaser does not provide remittance advice payments will be applied as Helena deems appropriate, in Helena's sole discretion."  HCC states that when Triple C Ranch did not provide remittance advice, it applied the payments to the "oldest item first by due date," but when Lee Cox gave remittance advice, it applied the payment as instructed.  HCC asserts that Lee Cox would have received all of the delivery tickets, invoices, and statement mailed at least monthly by HCC.  HCC asserts that from those documents, Lee Cox knew that HCC charged all of his purchases in 2006 to Triple C Ranch, yet he did not direct his payments to specific invoices.

The court disagrees with HCC's assertion that the deposition testimony of Lee Cox conflicts with his affidavit.  Lee Cox states in his affidavit, "without my knowledge or consent, Helena Chemical unilaterally started billing all of the products for Lee Cox Farms and Triple C Ranch to Triple C Ranch."  Although part of the deposition testimony was inaudible, Lee Cox's deposition testimony indicates that he was not initially aware that HCC was billing all of the products for both entities to Triple C Ranch. Ex. L, Lee Cox dep. p. 70, pltf.'s motion.  When he was no longer receiving Lee Cox Farms invoices, and Triple C Ranch invoices were going to his father, he talked to Craig Wynn about the situation.  *Id*. Thus, although it is clear that Lee Cox became aware of the billing issues, the timeframe in which that occurred is not entirely clear.

Taking the facts in light most favorable to defendants, Lee Cox had an agreement with agents of HCC regarding credit for Lee Cox Farms.  When Lee Cox became aware that HCC

was billing purchases made by Lee Cox Farms to Triple C Ranch, he confronted Craig Wynn and attempted to correct the situation.  HCC has not disputed Lee Cox's testimony with regard to his conversations with Craig Wynn and Curtis Hopkins.  Nor has HCC disputed defendants' assertion that Lee Cox confronted HCC about the improper billing.  Lee Cox does not state that he was informed, at any point, that Lee Cox Farms did not have any credit with HCC.  Rather, HCC informed him that it is "too hard for us to keep up with what's going where," so they wanted to put it all on one account.  HCC does not deny that Lee Cox Farms requested a credit extension in 2006.  Taking the facts in a light most favorable to defendants, summary judgment is not appropriate on this record.

Accordingly, defendant's motion for summary judgment (Doc. No. 15) is denied.

IT IS SO ORDERED this 9th day of July, 2009.


_____
UNITED STATES DISTRICT JUDGE